[Crim. No. 1850. Second Appellate District, Division Two.—August 2,
1929.]

THE PEOPLE, Respondent, v. ROY DeHOOG, Appellant.

Josiah Coombs for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

CRAIG, J.—The appellant and one Walter Dayly were charged by information, consisting of three counts, filed by the district attorney of Los Angeles County, with having on or about January 23, 1929, feloniously and burglariously entered the house of Abram Zacharonsky, with intent to commit theft; with having robbed said Zacharonsky, and also with having robbed Elizabeth Zacharonsky. Dayly testified for the People, admitting that he and another man committed all three offenses, but exonerating DeHoog from any participation therein. Both defendants were convicted, and the last-named defendant appealed.

It appears that on the date mentioned, at about 6:45 P. M., two men drove in an automobile to the residence in

question, went upon the porch, cut the front screen door, and rang the bell, to which Zacharonsky responded. As the door opened, each of them thrust a revolver in the proprietor's face, and said: "Throw up your hands; turn around; shut your eyes," and the door was quickly closed. Mrs. Zacharonsky entered the front room, and as she did so the intruders compelled her and her husband to proceed to a room adjoining, sat them on a bed, and tearing a sheet into strips, placed gags in their mouths, tied their feet and bound their hands behind them. Dayly demanded their rings, to which they replied that they had none. Zacharonsky testified that Dayly stated: "We know what you have got; we came for them and we are going to get them." Being threatened with torture unless she should reveal the whereabout of her valuables, Mrs. Zacharonsky accompanied Dayly's companion to a dresser in another room, where she had left her jewelry and $110 in money in her purse, all of which he took; he then returned her to the bed, where he menaced her and her husband with a revolver, while Dayly demanded of Mr. Zacharonsky a diamond ring which he pretended to know all about, and when told there was none, stated that he would proceed to torture him. He removed one of Zacharonsky's shoes, and began cutting the latter's sock with a large knife about six inches in length, in search of the ring. His victim was ill, in a weakened condition and badly frightened, and in spite of Dayly's threats of violence if he did not "shut up," he repeatedly fell back on the bed, and continued to groan. Mrs. Zacharonsky, facing the pistol held by the other man, and fearing for her husband's safety, advised him that he had "better tell." The latter then indicated that he had thrown the ring under the bed, whereupon Dayly, upon his hands and knees, recovered and took possession of this piece of jewelry, which contained a diamond valued at about $3,200. As the strangers were about to depart, Dayly indicated a lady's coat hanging by the door, and asked: "Is that the $1,500 coat?" to which his companion replied, "Yes, that is seal-skin." A young man by the name of Patrick Osio, returning home from a store, had noticed the men in a parked automobile as he passed, saw them approach the Zacharonsky home and walk upon the porch. He heard a noise which he characterized as a "zoom" when they cut the

screen, and as they rang the bell and the door opened he saw each of them thrust his hand forward, and enter. Becoming suspicious, he noted the license number of the machine, with which police officers thereafter located Dayly's room, where they found Dayly, DeHoog, one John Golden, and two others, all of whom were arrested. On the next day following the robberies the victims visited the jail and viewed the prisoners, spoke to them, and heard them talk, in a shadow-box.

Although Osio testified that the defendants were of about the same build, and one somewhat taller than the other, and the Zacharonskys swore that they were the men who entered their home and robbed them, appellant strenuously insists that the identification of himself wholly failed. It is truthfully said in his briefs that Osio admitted his inability to identify them, because he had not seen their faces. Zacharonsky testified that each wore a handkerchief covering his features below the eyes; that he saw only their foreheads and eyes, except upon one occasion when Dayly's mask dropped down; that he observed about one-third of the area of their hair, and noticed that Dayly's confederate spoke with a slight Swedish accent, and had quite a heavy bass voice. Attention is further called to the fact that Mrs. Zacharonsky remembered this man's voice as "not very strong, rather weak," and that she noticed no foreign accent. Her husband also testified that he was sure neither of the men had lost a finger, whereas during his cross-examination it was shown that Dayly had lost a portion of one finger. These, and other minor discrepancies in the testimony of the complaining witnesses, are assigned as "a bundle of contradictions from the first to the last. . . . A case of guessing on the part of Zacharonsky when he swore positively that the defendant DeHoog resembled in a general way the person who helped Dayly rob him." However, in view of all the circumstances, and in conjunction with the very positive testimony to the contrary, we are unable to say as a matter of law that the jury were more unjustly impelled toward conviction than were appellant's counsel in his favor by the fact, as it is asserted, that "these people were menaced by guns in the hands of the persons committing the robbery; and it is reasonable to suppose, reading the testimony of Zacharonsky, that he was excitable, nervous

and felt in danger." Notwithstanding a most exhaustive and technical cross-examination of the witnesses Zacharonsky, they were unwavering. During persistent efforts to draw from Zacharonsky an admission of doubt as to whether Dayly's companion in crime on the night in question was DeHoog or Golden, he was positive that it was the appellant, and swore that he eliminated Golden at once when he saw them both. He testified repeatedly in no uncertain terms that when he saw DeHoog at the jail he "pointed him out immediately"; that he was "very positive" it was DeHoog, and that he had never intimated that it might have been Golden. His testimony in this respect was: "I was positive right from the start that it was Dayly and DeHoog. A police officer who questioned Dayly within DeHoog's hearing, testified that Dayly offered to restore the stolen property if DeHoog could be permitted to "go back on parole"; and, further: "I asked Dayly why he should take such an interest in DeHoog, when DeHoog claims he did not know him. He says, 'Maybe DeHoog thinks he can beat the case.' That was in that same conversation. I asked him where he met DeHoog, and he said he met him in Folsom." Again: "Lieutenant McCaleb said, 'DeHoog, you heard what Dayly had to say?' DeHoog says, 'Yes.' He said, 'He would do well if he would take care of his own business and not be messing in mine.' That is all that the defendant DeHoog said. I also said, 'You heard what Dayly said in there?' He said, 'Yes.'" Mrs. Zacharonsky, when asked upon the stand as to the identity of Dayly and DeHoog, replied: "I am very positive." Defendant Dayly in his testimony stated that Osio had told practically the true story as to occurrences outside the house. He denied, with the same degree of positiveness, that DeHoog participated in the transaction, or that he had known him, although he admitted having seen him in Folsom prison. Dayly acknowledged under oath, and recognized the fact that officials from other jurisdictions were present to prove by their records that he had previously been convicted of felonies in the states of Oregon, Idaho, Montana and California. Though denying the purpose assigned by the prosecution therefor, he admitted having attempted to bargain with the police officers for DeHoog's release. The jury were instructed as to the credibility of witnesses and the weight

to be given to their testimony; as to the presumption of innocence and reasonable doubt. They were charged that "in this case the matter of the identity of any defendant here on trial with any person who may have taken part in the commission of the offense charged against him is a matter which is left entirely to the jury, and in this connection I charge you that the jury are the sole judges of the weight to be given to any evidence bearing upon the question of the identification of such defendant, as to whether same has been proved beyond a reasonable doubt." With all of the evidence before them the jury, under the admonitions of the trial judge, may well have disbelieved all of Dayly's testimony except that which was corroborated by an abundance of other evidence. We think appellant's identity was sufficiently established in spite of Dayly's denials, and we are not disposed to devote extended consideration to conflict in this respect.

██ Certain questions propounded by the trial court to Mrs. Zacharonsky, during her cross-examination, are assigned as misconduct and prejudicial, as suggestive of new evidence not disclosed by either counsel. In response to questions of appellant's attorney, she testified that she was acquainted with and had for some time known his sister-in-law, Mrs. Marie DeHoog; that the latter called her upon the telephone two or three days after the robbery, but she denied that she had called Mrs. DeHoog, or that they had more than one conversation. The witness said that Mrs. DeHoog felt very badly about the occurrence, and "wanted to know why I didn't phone her about it, and I said: 'I didn't want to, Marie.' I knew she wasn't to blame for it in any way." Objections to further questions as to hearsay and immaterial matters were sustained, whereupon the following occurred:

"The Court: Had Mrs. DeHoog been a visitor at your home?

"A. Well, she and her mother visited me, oh, some about three years ago.

"Q. You had not seen her for some time?

"A. I visited her mother's place. I have seen her there two or three times.

"The Court: All right. Go ahead. Had you worn this sealskin sack out there?

"A. Yes.

"Mr. Eddie: I object to the question of the court on the ground it is incompetent, irrelevant and immaterial.

"The Court: Very well, strike it out. The jury is instructed to disregard it.

"Mr. Eddie: Ask that the jury be instructed to disregard it.

"The Court: You may disregard it, ladies and gentlemen of the jury."

It is contended that, without provocation, and in order to "supply the groping minds of the jurors" with an unfounded insinuation that DeHoog's sister-in-law furnished him with information as to the Zacharonskys' wealth, the trial judge went outside his province. That, upon learning that the witness had not seen Mrs. DeHoog for a period of three years, he persisted in following up the inquiry about a sealskin coat. It is characterized as inexcusable, and prompted by "a zeal incompatible with the dignity of the court to supply a connecting link between the defendant and Mrs. DeHoog." As heretofore observed, Mr. Zacharonsky had testified regarding the sealskin coat, which the men apparently recognized. His testimony in this respect was as follows: "But my wife's sealskin coat was hanging in her dressing room, and Dayly walked up to it, and felt of it, and he says, 'Is that that $1500 coat?' My wife shook her head then this way [indicating]. DeHoog says, 'Yes, that is sealskin.'. . . Hanging in my wife's dressing room, right on the edge—well just on the edge of the door." These questions by the court appear to have emanated from an effort to eliminate immaterial matters and to expedite the examination, rather than from injudicious zeal or caprice. They followed a somewhat persistent endeavor to elicit telephonic conversations to which objections by the district attorney were sustained, after the witness had so testified as to intimate that there might have been visits at the DeHoog residence within the three-year period. The answer of Mrs. Zacharonsky regarding the wearing of her coat was stricken out, and the jury were twice admonished to disregard it; and in the charge they were instructed to disregard evidence and remarks which had been stricken out. Mrs. DeHoog was absolved by this witness from any blame, and as to whether the questions by the court or by counsel

in this regard contemplated disproof of the defendant's guilty knowledge, or proof of his observations during visits between appellant and his sister-in-law that might appear was suggested by his own counsel, and is not properly attributable to ulterior motives of the court whose object is not apparent. We find no error in this behalf.

■ It is also urged that burglary and theft occurring, as here, in the same house within about thirty minutes, they constituted but one offense. The rule has been otherwise announced in former decisions, and they were properly charged and proven separately. (*People* v. *Snyder*, 74 Cal. App. 138 [239 Pac. 705]; *People* v. *Sharp*, 58 Cal. App. 637 [209 Pac. 266].)

■ Appellant complains that the jury should have been more fully instructed upon the law as to proof of identity where such question is in issue. As already observed, the trial court did instruct them upon this subject. It was stipulated that the court should orally instruct the jury, and no further instruction in this respect was requested. We find no error in this regard. (*People* v. *Weber*, 149 Cal. 325 [86 Pac. 671].)

Other assignments of alleged error consist of questions by the district attorney to which no objection was interposed, or upon matters already opened up by the defense and similar points which do not require further discussion.

The judgments are affirmed.

Works, P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 16, 1929, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 29, 1929.

All the Justices concurred.